UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

MELINDA JOY WARREN )
)
V. ) NO. 2:14-CV-313
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. This is a judicial review of the final decision of the Commissioner following a hearing before an Administrative Law Judge ["ALJ"], which denied the Plaintiff's applications for disability insurance benefits and supplemental security income under the Social Security Act. The Plaintiff has filed a Motion for Judgment on the Administrative Record [Doc. 11] and the Defendant Commissioner has filed a Motion for Summary Judgment [Doc. 16].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try

the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, Aa decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff is presently 45 years of age, and was 39 on alleged disability onset date of April 29, 2009. She has a high school education. There is no dispute that she cannot return to her past relevant work.

The Plaintiff's medical history is summarized in her brief as follows:

> Ms. Warren was treated by Dr. Samson K. Orusa, M.D. PC, from October of 2010 through January of 2013. (AR. at pp. 409-80.) Dr. Orusa treated Ms. Warren for hyperthyroid disease and chronic pain caused by degenerative joint disease. Dr. Orusa prescribed synthroid, flexeril, and hydrocodone. Dr. Orusa's exam notes reflect that Ms. Warren's thyroid levels were "well controlled" by April 4, 2011 but was persistently plagued by chronic pain throughout their treatment relationship. Ms. Warren consistently reported pain of 10 out of 10 without pain medication and 4 out of 10 while taking hydrocodone. Dr. Orusa's exams consistently revealed that Ms. Warren was "positive for muscle pain, back pain, [j]oint pain and body aches." (AR. at p. 413-80.) X-ray results in February of 2011 revealed degenerative joint disease in Ms. Warren's left knee and degenerative disc disease in her lumbar spine. (AR. at pp. 445-47.)
> On April 13, 2011, Dr. Stephen K. Goewey, M.D., a DDS examining consultant, noted that Ms. Warren is 5'9" tall and weighed 320 pounds. (AR. at pp. 299-309.) Dr. Goewey's review of systems reveals no heart problems, that her radial pulses and reflexes were normal at 2+, that she ambulated "in a normal fashion," could not tip-toe or heel walk, and exhibited positive straight leg raises when prone but negative when seated. (AR., Doc. 8, pp. 301-02.) As to range of

2

motion, Dr. Goewey normal range of motion ("ROM") in Ms. Warren's cervical and dorso-lumbar spine with only minor limitations in hip ROM. According to his exam results, Dr. Goewey observed that Ms. Warren's hip flexion was reduced to 70 degrees. Based simply on his exam results, Dr. Goewey concluded that Ms. Warren retains the residual functional capacity ("RFC") to lift and carry 100 pounds occasionally and 50 pounds frequently, can sit for 1 hour at a time up to 7 hours over the course of an 8 hour work day, can stand for 1 hour at a time up to 5
hours over the course of an 8 hour work day, and can walk for 30 minutes at a time up to 4 hours over the course of an 8 hour work day. (AR. at p. 304-05.)

Dr. Goewey assessed no limitations in Ms. Warren's ability to push pull or use her hands in work related activities. He did, however, limit her to using her feet on a frequent basis. (AR. at p. 305-06.) Further, Dr. Goewey opined that Ms. Warren can engage in all postural activities on a frequent basis; is limited to driving an automobile on an occasional basis; can only be exposed to moving mechanical parts on a frequent basis; and can engage in activities such as shopping, travel without a companion, ambulate without aid, walk a block on even or uneven surfaces, use public transportation, climb stairs or steps at a reasonable pace without aid, prepare a simple meal, care for her personal hygiene, and sort and handle paper files. (AR., Doc. 8, pp. 307-08.)

Ms. Warren returned to Dr. Orusa on April 15, 2011 reporting pain levels at 10 of 10 without hydrocodone and 4 of 10 with hydrocodone. (AR. at p. 434.) Consistent with his treatment notes over the prior seven months, Dr. Orusa noted that Ms. Warren was "positive for muscle pain, back pain, [j]oint pain and body aches." (AR. at p. 434.) On June 28, 2011, Dr. Orusa increased the dosage of hydrocodone Ms. Warren was taking from one tablet per day tofour tablets per day as needed. (AR. at p. 430.)

On July 10, 2011, Dr. Evelyn Davis, M.D., a DDS reviewing consultant, conducted a review of Ms. Warren's medical record. (AR. at pp. 334-42.) In so doing, Dr. Davis gave only "partial weight" to Dr. Goewey's RFC assessment. (AR. at p. 340.) According to Dr. Davis, "greater weight [wa]s given to the severity of [the] cl[aimant]'s obesity and the less than optimal control of her hypothyroidism." (AR. at p. 340.) Unlike Dr. Goewey, Dr. Davis opined that Ms. Warren retained the RFC to lift and carry only 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 hours over the course of an 8 hour work day; sit for 6 hours over the course of an 8 hour work day; push and pull without limitation; occasionally balance, stoop, kneel, crouch, crawl, or climb ramps, stairs, ladders, or scaffolds. (AR. at pp. 335-36.) Dr. Davis assessed no manipulative or environmental limitations. (AR. at p. 337-38.)

On November 23, 2011, Dr. Cassandra Comer, M.D., also a DDS reviewing consultant, confirmed Dr. Davis' assessment. Dr. Comer opined, like Dr. Davis, that Ms. Warren retains the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 hours over the course of an 8 hour work day; sit for 6 hours over the course of an 8 hour work day; push

3

and pull without limitation; occasionally balance, stoop, kneel, crouch, crawl, or climb ramps or stairs. (AR., Doc. 8, pp. 400-01.) Further, like Dr. Davis, Dr. Comer assessed no manipulative or environmental limitations, but, unlike Dr. Davis, Dr. Comer opined that Ms. Warren should never climb ladders, or scaffolds. (AR. at pp. 401-03.)

On December 16, 2011, Ms. Warren reported continued pain of 10 on a scale of 10 without pain medications and 4 out of 10 with pain medications. Dr. Orusa'a exam again confirmed "muscle pain, back pain, joint pain and body aches and pain." (AR. at 427.) On January 10, 2012, Dr. Orusa noted significant reductions in ROM in Ms. Warren's lumbar and cervical spine, her hips, and her ankles. (AR. at pp. 409-10.) In the eight months since Dr. Goewey's exam, the ROM in Ms. Warren's hip flexion was further reduced from 70 degrees measured by Dr. Goewey to 60 degrees. In addition, Dr. Orusa found that her hip extension was reduced from 30 degrees to 10; abduction from 40 degrees to 20; adduction from 20 degrees to 10; internal hip rotation from 40 degrees to 20; and external rotation from 50 degrees to 20.

Further, unlike Dr. Goewey, Dr. Orusa found that Ms. Warren was limited in her cervical spine from the normal 45 degrees in right and left lateral flexion to 20 degrees. Her lumbar flexion was reduced from 90 degrees to 30, extension from 25 degrees to 10, right lateral flexion from 25 degrees to 10, and left lateral flexion from 25 degrees to 5. Also unlike Dr. Goewey, Dr. Orusa found that Ms. Warren's bilateral dorsiflexion was reduced from 20 degrees to 5 and bilateral plantar flexion was reduced from 40 to 10. (AR. at pp. 409-10.) Ms. Warren's complaints and Dr. Orusa's medical findings remained unchanged from the January 10, 2012 exam through December of that same year. (AR. at pp. 412-22, 472-80.)

On December 12, 2012, Ms. Warren was referred to Dr. Robert D. Todd, M.D., an orthopaedic specialist. (AR., Doc. 8, p. 556-57.) Ms. Warren complained of shoulder pain, low back pain radiating into her right lower extremity, knee pain, and ankle pain. Dr. Todd observed that she presented with an antalgic gait, she exhibited equivocal straight leg raise results on the right and negative on the left, demonstrated pain to palpation, and exhibited no patellar or Achilles reflexes. MRI results of Ms. Warren's lumbar spine revealed mild to moderate bilateral arthropathy accompanied by mild disc degeneration at L2-L3; mild disc degeneration, moderate bilateral facet arthropathy, and compression of the spinal canal at L3-L4; disc degeneration with a 1-2 mm paracentral disc protrusion at L4-L5 accompanied by borderline central canal and left L5 lateral recess stenosis and mild left L-4; and disc degeneration, mild space narrowing, and a posteriocentral disc protrusion at L5-S1. (AR. at p. 555.) Although Dr. Todd opined that these degenerative changes were "significant," he found "no lumbar pathologic restraint that would limit [Ms. Warren] working" and recommended lumbar steroid injections with pain management. (AR. at pp. 552-53.)

[Doc. 12, pgs. 2-6].

4

The Plaintiff's administrative hearing was held in Nashville, Tennessee on March 25, 2013, before ALJ Elizabeth Neuhoff. After listening to the Plaintiff's testimony, the ALJ examined Dr. Kenneth Anchor, a Vocational Expert ["VE"]. She told Dr. Anchor that she was basing her hypothetical question on the psychological report of Dr. Kendall, the State Agency psychologist whose report begins at Tr. 315; and the report of State Agency physician Dr. Conner, whose report begins at Tr. 399. She asked Dr. Anchor to assume an individual who could lift or carry 20 pounds occasionally and 10 pounds frequently, who could sit, stand or walk for a total of six hours in each of them. She asked him to consider that the person could never climb ladders, ropes or scaffolding; and could "occasionally perform all other postural activities." She asked him to assume the person could not perform any fine visual work, such as sewing or bead work. Also the person would be restricted from work around hazards such as unprotected heights or moving machinery. Also, the person would be limited to unskilled work consisting of simple tasks and instructions. It would be better if the person could be shown how to do a task as opposed to being told how to perform the task. The person could adequately concentrate on, attend to and complete such simple tasks. The person could have no contact with the general public, have only work related contact with supervisors and coworkers, could not "perform production, pace or quota-type work, and could handle occasional changes to the work place routine, setting or location." When asked if there were jobs which such a person could perform, he identified the jobs of office helper, with 1,200 jobs in Tennessee and 56,000 in the nation; table worker, with 850 in Tennessee

5

and 34,000 in the nation; and general clerk, with 3,700 in Tennessee and 161,000 in the nation. If the Plaintiff had the limitations she described in her testimony, there would be no jobs. (Tr. 59-63).

ALJ Neuhoff rendered her hearing decision on May 7, 2013. She found that the Plaintiff had "insured status" for disability insurance benefits through December 31, 2012, which means that to collect such benefits she would have to establish disability on or before that date. She found that the Plaintiff had not worked since her alleged onset date of April 29, 2009. The ALJ then found that the Plaintiff had severe impairments of "degenerative disc disease of the lumbar spine; bipolar disorder; alcohol abuse; morbid obesity; hyperthyroidism (Graves disease) with correlated issue with visual discrimination (but does not wear glasses); and degenerative disc disease of the left knee." (Tr. 12). The ALJ recognized that the Plaintiff had alleged impairments of plantar fasciitis, hypertension, and bowl problems, but that these impairments were not shown by the evidence to be "severe in the sense that they result in additional functional limitations beyond those associated with the claimant's severe impairments." (Tr. 13).

The ALJ then found that the Plaintiff met or equaled none of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I. In making this determination, she assessed her mental impairment. She found that she has moderate restrictions as to activities of daily living; social functioning; and concentration, persistence or pace. She also noted her activities, including preparing meals, doing household chores, leaving home twice a day, driving, shopping, crocheting, watching television, following recipes,

6

and managing medications. Thus, Plaintiff did not have deficiencies in any of these mental areas which would meet the requirements of any listed impairment. (Tr. 14).

She then announced her finding with respect to the Plaintiff's residual functional capacity ["RFC"]. She found that Plaintiff "has the residual functional capacity to perform light work...limited to lifting and/or carrying twenty pounds occasionally and ten pounds frequently; sitting, standing, or walking six hours total each in an eight-hour workday; never climbing ladders, ropes, or scaffolding; occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; no fine visual work such as sewing or beadwork; no work around hazards found in the workplace; limited to unskilled work consisting of simple tasks and instructions; would be better if shown how to do a task rather than told; can adequately concentrate, attend to, and complete such simple tasks and instructions; no contact with general public; work-only related contact with coworkers and supervisors; no production pace or quota-type work; and can handle occasional change in the workplace routine, setting, or location." (Tr. 14). As part of this process, the ALJ discussed the Plaintiff's symptoms and her credibility. (Tr. 15).

The ALJ stated that she did not find the Plaintiff completely credible. She pointed out that "the record confirms morbid obesity at 5'10" tall and 334-346 pounds." She stated that the Plaintiff asserts limitations in her ability to stand, walk, sit, reach and perform postural activities and experienced fatigue and dizziness which allegedly affected the Plaintiff's ability to perform daily activities and to drive. At the hearing, the ALJ noted that Plaintiff was the primary caregiver of her 13 year old son. She noted

7

Plaintiff's history of alcohol use and that Plaintiff denied any current use. The ALJ said Plaintiff had Graves' disease since age 23. She noted that Plaintiff testified she can drive short distances but has no valid license. Plaintiff has a computer which she uses, and a Facebook page. She stated Plaintiff reported walking daily for exercise up to ½ mile before having to take a break. Plaintiff said she could stand for 30 minutes and sit for 15 minutes and occasionally lift a half gallon of milk. The ALJ noted that the hearing lasted far longer than 15 minutes and the Plaintiff did not have to get up during the 34 minutes it lasted, contradicting Plaintiff's saying she could only sit for 15 minutes. (Tr.14).

The ALJ then discusses what she considers the "objective medical evidence," after opining that it "is fully consistent" with the RFC finding. She noted that the medical evidence began with a consultative examination in April 2009, which came about as a result of Plaintiff filing her applications for benefits in January of that year. The ALJ pointed out that there is no evidence in the administrative record of any treatment for her physical impairments until October, 2010, when Dr. Orusa began treating her for Graves' disease. The ALJ noted how that the Plaintiff's Graves' symptomology improved dramatically once Dr. Orusa began treating her. By January of 2011, the ALJ stated that the Plaintiff's TSH level had improved to 13.44 from 22.85 in 2010. In February of 2011, Plaintiff's TSH level improved to 6.86. In March 2011, while Plaintiff described her pain without medication to be 10/10, Dr. Orusa said it was 4/10 with medication. Plaintiff's dizziness was noted to have improved by Dr. Orusa, although Plaintiff reported

8

"occasional alcohol consumption." By April 2011, Dr. Orusa stated that Plaintiff's TSH level was normal at 3.8. The ALJ stated that through all of this time, the Plaintiff exhibited no observable gait abnormalities. (Tr. 16-17).

The ALJ noted the second consultative exam in April 2011. There were some problems with straight leg raising, but she had a good motion in all other joints, no edema, 5/5 motor strength, intact sensation, and intact "straightaway gait." (Tr. 17).

The ALJ then mentioned that Dr. Orusa stated in his treatment notes that Plaintiff tested positive for marijuana use in May of 2011. Plaintiff reported bilateral knee pain, and the exam showed bilateral knee tenderness. The spine revealed mild spondylotic and facet degenerative changes without fractures or subluxations. At a subsequent visit, although Plaintiff stated her medications were not working, Dr. Orusa still found her pain to be 4/10 with her medication. Also, he noted no abnormal physical exam findings. In July of 2011, Dr. Orusa noted that the Plaintiff ran out of Lortab early, despite the number of pills being increased, and that her UDS was negative for opiates but positive for marijuana. However, he continued to prescribe Lortab and Flexeril. After the July visit, the Plaintiff did not see Dr. Orusa again until December, 2011. At that visit, Dr. Orusa stated that Plaintiff did not quit taking synthroid, but the ALJ said that noncompliance was a reasonable inference because 5 months before she had been given a 3 month supply. (Tr. 17).

In January 2012, the Plaintiff once again visited Dr. Orusa. In January, her UDS was again inconsistent. Her pain continued to be rated 4/10 with medication and no

9

Case 2:14-cv-00313-JRG-MCLC Document 18 Filed 08/24/15 Page 9 of 17 PageID #: 673

adverse side effects, although her TSH level increased even though she reported compliance with treatment. Her medications were adjusted. She "reported only occasional alcohol use." She saw Dr. Orusa in April and May, but the only treatment was medication refills. (Tr. 18).

There was no follow up evidence from May, 2012 until she was referred to Dr. Robert Todd, an orthopedic specialist, in December of 2012. Dr. Todd saw the Plaintiff on numerous occasions between then and March of 2013. The ALJ noted his objective findings on the MRI of her lumbar spine. She also noted that at her last visit to Dr. Todd in March 2013, Plaintiff told the doctor that she wanted to apply for disability. Dr. Todd said that "at her age, she should consider going back to work," and that "[c]ertainly there is no lumbar pathologic restrains that would limit her working, only her pain." (Tr. 550). The ALJ also noted that Plaintiff did not see Dr. Orusa between May of 2012 and January of 2013, at which time he still opined that her pain was 4/10 on medication. (Tr. 18).

The ALJ gave great weight to Dr. Todd because "it is consistent with the medical evidence of record and the Plaintiff's extensive activities of daily living." She then discussed the other opinion evidence. She gave greater weight to the State Agency medical consultants who opined Plaintiff could perform activities consistent with a reduced range of light work, as opposed to the opinion of Dr. Goewey, the consultative examiner who opined that the Plaintiff could perform medium work around moving machinery parts. She thus gave Plaintiff the benefit of the doubt, and incorporated the State Agency doctors' opinions into her RFC determination. (Tr. 18-19).

10

Case 2:14-cv-00313-JRG-MCLC Document 18 Filed 08/24/15 Page 10 of 17 PageID #: 674

She then discussed Dr. Orusa's opinions. She said that Dr. Orusa never did give the Plaintiff specific physical limitations, just noted decreased range of motion in some joints. Dr. Orusa opined numerous times that the Plaintiff showed improvement with treatment when she took her medication, and the ALJ found that would "not conflict with the limited range of light exertional work activity." that the ALJ found in her RFC finding. She gave no weight to Dr. Orusa's statements that the Plaintiff did not abuse substances, or that she would miss work excessively. She so found because of the multiple inconsistent UDS reports and the fact Dr. Orusa found that the Plaintiff's pain was reduced by medications which enabled her to perform household chores. (Tr. 19).

The ALJ then pointed out the evidence that supported her RFC finding, such as 5/5 motor strength on examination, the April 2009 normal range of motion from cervical spine to ankle, lack of observable gait abnormalities, and the normal results on physical exams other than supine straight leg raising. She also noted the lab work and the imaging studies. The ALJ found that the Plaintiff's daily activities were in conformity with the RFC finding. (Tr. 19).

The ALJ then discussed the Plaintiff's mental impairments. Once again, the Plaintiff did not begin mental health treatment in the record until October 2010, almost a year and a half after her April 2009 alleged onset date. She noted that the Plaintiff was diagnosed with bipolar disorder at the October 2010 visit. She was seen again in December 2010 and continued to have treatment from January to June 2011. She had improved mood, sleep and less anxiety with her medications. She reported drinking

11

only one beer a month. At another visit, she reported going to AA meetings. In June, she told them that her symptoms had increased because she was out of medications because "she had traveled to Michigan with her father and had been stuck there for a month."

The ALJ stated Plaintiff had no further mental health treatment until October 2012, when she reported having been out of medication for eighteen months and sober for 18 months. Her medications were continued at that time. (Tr. 20).

The ALJ noted the findings at her two consultative mental evaluations in April 2009 and April 2011 and the opinions of the State Agency psychologists. She gave great weight to the latter. She gave little weight to Dr. Orusa's opinion in January 2012 that the Plaintiff had severe mental impairments of memory, concentration and social ability and would miss work excessively. She did so because Dr. Orusa is a specialist in internal medicine who does not treat Plaintiff's mental problems, and because Dr. Orusa's treatment notes state that Plaintiff is alert and oriented with normal speech, intact memory and appropriate appearance. Also, once again, the ALJ expressed lack of confidence in Dr. Orusa's opinion that the Plaintiff did not abuse substances when her UDS reports were so out of balance with the number of drugs prescribed. Finally, the lack of treatment until 15 months after her alleged onset date did not impress the ALJ. (Tr. 21-22).

Based upon the Plaintiff's alleged misuse of medications and alcohol, the ALJ found her allegations of mental limitations were inconsistent with the records from times

she was compliant with treatment. During those times, the ALJ noted her symptoms improved with no negative side effects. The ALJ found that "her impairments are limiting, not disabling." (Tr. 23).

Even though the Plaintiff could not return to her past relevant work, the ALJ found, based upon the testimony of the VE, that a significant number of jobs existed in the national economy that she could perform. Accordingly, she found that the Plaintiff was not disabled. (Tr. 23-25).

Plaintiff first asserts that the ALJ erred by not properly considering the effects of Plaintiff's morbid obesity on her other severe impairment. In this regard, she alleges that the ALJ did not properly follow Social Security Ruling 02-1p. In addition to describing obesity, that ruling provides that the Commissioner will consider obesity at many steps in the sequential evaluation process, including whether a claimant has a medically determinable impairment, whether the impairment(s) is severe, whether the impairment(s) meet or equal a listed impairment, and whether a claimant's impairment(s) preclude performance of past relevant work and other work in the national economy. The ruling also states that the Commissioner "will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record." *Id.* at page 6.

Plaintiff asserts that the ALJ's heavy reliance on the 2011 opinions of the State

13

Case 2:14-cv-00313-JRG-MCLC Document 18 Filed 08/24/15 Page 13 of 17 PageID #: 677

Agency physicians, Drs. Davis and Comer, was misplaced because, as non-examining physicians, they relied upon earlier range of motion studies conducted by Dr. Goewey, the consultative examiner, in 2011. They did not have the benefit of the records from January of 2012 which Plaintiff asserts showed a worsening of her condition due to obesity. It is noted however that they both found the Plaintiff much more limited than Dr. Goewey did when he actually examined her.

With respect to SSR 02-1p, "the Sixth Circuit declared it 'a mischaracterization to suggest that Social Security Ruling 02-1p offers any particular procedural mode of analysis for obese disability claimants.'" *Coldiron v. Commissioner of Soc. Sec.*, 391 Fed. Appx. 435, 443 (6th Cir. 2010), citing *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir. 2006). In the present case, as in *Coldiron*, the ALJ "discussed obesity multiple times throughout (her) findings of fact." *Id.* She found that the Plaintiff's morbid obesity was a severe impairment (Tr. 12). She considered it when determining if the Plaintiff met or equaled any listing, and specifically stated that she considered SSR 02-1p. (Tr. 13). She mentioned it when discussing how she arrived at her RFC finding. (Tr. 15). Also, the ALJ had before her, and discussed, the reports of Dr. Todd, the Plaintiff's treating orthopedist, who when the Plaintiff advised him that she was seeking disability, told her she should keep working as he could see no pathology in her lumbar region that would prevent her from working (Tr. 18). He was undoubtedly aware that the Plaintiff was morbidly obese at the time he made this statement. While it is true that she had other problems which Dr. Todd did not mention at that time, such as knee pain and ankle

14

problems, it is also true that she did not mention problems with her knee or ankles while under his care. Also, in a letter to the ALJ sent March 21, 2013 giving an overview of the Plaintiff's case in advance of the hearing, Plaintiff's counsel says her "records document a history of Lumbar Spondylosis, Graves' Disease, Bipolar II Disorder, Plantar Fascitis, Hypertension, and obesity." (Tr. 225). There is no mention of knee or ankle problems in that letter.

Thus, the ALJ discussed Plaintiff's obesity throughout the hearing decision, and gave great weight to Dr. Todd, who undoubtedly considered her obese condition. Based upon *Coldiron*, *supra*, "the ALJ adequately accounted for the effect that obesity has on (Plaintiff's) ability." to work.

Plaintiff also asserts that the ALJ did not properly weigh the opinion evidence. She asserts that "ALJ Neuhoff's consideration of the medical opinion evidence in the case at bar is myopic and focused exclusively upon arriving at an unfavorable ruling." As an initial matter, this Court could not detect a hint of bias or bending of the rules by this ALJ either in the transcript of the hearing or in her hearing decision. It is true that the ALJ did not completely reject the opinion of any physician in the record, but this is more probative of an ALJ spending the time to thoroughly consider each opinion than of "cherry picking," as the Plaintiff suggests.

In this regard, Plaintiff asserts that the differences between Dr. Goewey's range of motion findings, and those of her treating physician, Dr. Orusa, are not adequately addressed by the ALJ. For a host of stated reasons, the ALJ did not give great weight to

15

Dr. Goewey because she believed, based upon the State Agency physicians, Dr. Todd, and the Plaintiff's testimony at the hearing that she was not capable of the heavy work opined by Dr. Goewey. While Dr. Orusa found a reduced range of motion from the findings of Dr. Goewey, Dr. Orusa did not place any specific limitations on the Plaintiff's activities. Also, even though her range of motion deteriorated, Dr. Orusa's treatment notes indicate substantial improvement when the Plaintiff took her medication. This improvement enabled her to perform her household chores, to exercise for several hours a day, and to walk for up to one half mile before stopping to rest. Also, the ALJ gave good reasons for rejecting Dr. Orusa's opinion that the Plaintiff would miss work frequently because of her mental problems. As the ALJ stated, Dr. Orusa is not a mental health practitioner, and there is substantial evidence from those who are to support the functional limitations the ALJ gave the Plaintiff based on her mental condition.

The Court finds nothing mysterious or improper in the way the ALJ ascribed weight to the various opinions. There was substantial evidence to support her RFC finding and she adequately followed the regulations, Social Security Rulings, and case law. Accordingly, there was substantial evidence to support the opinion of the VE that a substantial number of jobs exist in the national and regional economies that the Plaintiff could perform. It is therefore respectfully recommended that Plaintiff's Motion for Judgment on the Administrative Record [Doc. 11] be DENIED, and the Commissioner's Motion for Summary Judgment [Doc. 16] be GRANTED.[1]

---

[1] Any objections to this report and recommendation must be filed within fourteen (l4)

Respectfully submitted,


                                                        ⎯⎯⎯s/Clifton Corker⎯⎯⎯⎯⎯
                                                        United States Magistrate Judge

---

days of its service or further appeal will be waived.   28 U.S.C. 636(b)(1).